# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| COACHMEN INDUSTRIES, INC. | § | |
|      Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-0892 |
| | § | |
| WILLIS OF ILLINOIS, INC., | § | |
|      Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court in this action are two dispositive motions and related motions to strike.  Defendant Willis of Illinois, Inc. ("Willis"), has filed a Motion for Summary Judgment [Doc. # 79].  Plaintiff Coachmen Industries, Inc. ("Coachmen") has filed a Response and Cross-Motion for Partial Summary Judgment on three of the four claims asserted against Willis [Doc. # 85].[1]  Willis has replied/responded [Doc. # 105] and Coachmen has replied [Doc. # 113].  Former Defendant Alternative Services Concepts, LLC ("ASC") also responded to Willis's motion, but only as to

---

[1]    At the Court's request [Doc. # 117], Coachmen submitted an amended version of its Response and Cross-Motion [Doc. # 121] that clarified references to exhibits.

    Since Coachmen filed its Cross-Motion for Summary Judgment, the Court issued an opinion on choice of law issues that led to dismissal of Coachmen's two statutory claims, on which Coachmen sought summary judgment. *See* Memorandum and Order of April 28, 2008 [Doc. # 152], at 18–22.  Given that decision, the Court does not address any arguments raised by the parties regarding these claims. The only remaining claims in this case are for breach of contract and negligence.

one of the claims at issue [Doc. # 86].  Willis replied [Doc. # 92] and ASC filed a

surreply [Doc. # 99].[2]  Although Coachmen and ASC have since settled their dispute,

Coachmen adopted the arguments raised by ASC in its submissions regarding Willis's

summary judgment motion.  Accordingly, those documents remain relevant to the

pending motions for summary judgment.  In addition, at the Court's request, in light

of the Court's decision on choice of law questions [Doc. # 152], Coachmen and Willis

have filed supplementary briefs [Docs. # 156 and # 155, respectively].[3]  Having

considered the parties' submissions, all matters of record, and applicable law, the

---

[2]  Because the parties continued to file memoranda regarding the motions for summary judgment, and in order to close the record and fully consider these motions, the Court ordered that the parties cease filing documents associated with the pending motions for summary judgment unless requested by the Court.  *See* Order of Jan. 22, 2008 [Doc. # 128].  Coachmen subsequently filed a Motion to Clarify the Court's Order in which it, *inter alia*, sought permission to file a "Response" to a document filed by Willis responding to Coachmen's motion to strike a brief filed by former Defendant ASC [Doc. # 120].  *See* Motion to Clarify [Doc. # 129], ¶ 5.  This motion is **denied**.

[3]  The Court held that Illinois law governs resolution of Coachmen's breach of contract claim.  Thus, due to this holding, and because the parties' summary judgment motions cite only Texas law, the parties were directed to submit briefing on any relevant conflicts between Texas contract law and Illinois contract law.  *See* Memorandum and Order of April 28, 2008 [Doc. # 152], at 24–25.  The only conflicts identified involve the availability of attorneys' fees in a breach of contract action and some nuances regarding waiver and estoppel. *See* Willis's Supplemental Memorandum [Doc. # 155]; Coachmen's Supplemental Memorandum [Doc. # 156], at 6–7.  The Court addressed the attorneys' fees issue in its Memorandum and Order of May 8, 2008 [Doc. # 158], at 5.  Waiver and estoppel will be addressed briefly later in this Memorandum.  Because the remainder of the parties' briefing on Coachmen's breach of contract claim cites exclusively to Texas law, which the parties agree is not in relevant conflict with Illinois law, the Court relies on and cites Texas law in this Memorandum.  ***Any future briefing in this case regarding the contract claim must primarily cite Illinois law***.

Court concludes that Willis's Motion for Summary Judgment should be **granted in part** and **denied in part** and Coachmen's Cross-Motion for Partial Summary Judgment should be **denied**.

Coachmen and Willis also have filed Motions to Strike various portions of affidavits submitted in support of each party's motion for summary judgment [Docs. # 84 and # 102, respectively].  Each party has responded [Docs. # 110 and # 103, respectively].  The objections raised by Coachmen and Willis largely concern the proper weight to be given to the challenged evidence, rather than its admissibility under the rules of evidence.  In any event, the Court does not rely on inadmissible evidence in reaching the holdings discussed herein.  Thus, both Motions to Strike are **denied as moot**.

## I.  <u>BACKGROUND</u>

Coachmen is a manufacturer of travel trailers.  Since 1996, Coachmen has worked with an insurance broker,[4] Defendant Willis, to aid Coachmen in obtaining insurance coverage.  As Coachmen's insurance broker, Willis undertook each year to

---

[4]  "An [insurance] agent represents the insurance company.  An insurance broker represents the client."  Coachmen's Response to Willis's Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Coachmen's Response & Cross-Motion") [Doc. # 121], Exh. E:  "Deposition: Willis's Executive V.P. of Claims, Butch Marros," at 25.  For purposes of this case, there is no legally significant distinction between an insurance agent and an insurance broker.  *See May v. United Servs. Ass'n*, 844 S.W.2d 666, 669 n.8 (Tex. 1992).

survey the insurance market and obtain policy quotes from insurers offering services meeting Coachmen's needs.[5]   Willis then drafted and presented to Coachmen "brokerage proposals" outlining Coachmen's options, Willis's recommendations, and various other obligations on the part of each party.[6]

In 2001, Willis guided Coachmen in securing a variety of traditional insurance policies with third party insurers. Between May 1, 2001, and May 1, 2002, Coachmen's  primary liability insurance policy was issued by CNA Insurance Company ("CNA"); Coachmen also had an excess coverage—or "umbrella"—policy issued by Gulf Insurance Company ("Gulf"). The Gulf policy included a requirement that Gulf be given "prompt written notice" of any liability claims arising from, *inter alia*, "severe burns or disfigurement."[7]   Coachmen alleges that Willis failed to properly notify the company of this obligation.

In 2002, Coachmen, with the aid of Willis, began subscribing to the "Alembic" program, an offshore insurance group captive through which Coachmen received

---

[5]   *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. B: "Affidavit, Willis Account Manager, Dan Hawver," ¶ 3.

[6]   *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. AG: "Brokerage Proposal: 2003-2004"; Willis's Reply & Response [Doc. # 105], Exh. A: "Brokerage Proposal:  2001-2002"; Exh. D: "Brokerage Proposal:  2004-2005."

[7]   *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. E:  "Gulf Insurance Group Umbrella Insurance Policy," at Endorsement No. 16, Bates No. W00039. (Because this document is not separately paginated, references are to the Bates number stamped on each page.)

certain types of insurance.[8]  Willis also brokered policies for Coachmen outside of the Alembic program.[9]  Willis admits that after Coachmen subscribed to the Alembic program Willis assumed "additional limited responsibilities for overseeing Coachmen's third-party administrator[10] with respect to certain kinds of insurance claims."[11]  Coachmen disputes this characterization and argues that Willis's duties as a broker were the same regardless of Coachmen's involvement with the Alembic program.

In July 2003, Coachmen, apparently on the advice of Willis,[12] hired former Defendant ASC to be its third party claims administrator, responsible for, *inter alia*, notifying Coachmen's insurance carriers of claims brought against the company.[13]

---

[8]     An "insurance group captive" is essentially an in-house self-insurance vehicle that offers members—primarily members with risks that are difficult to insure on the traditional insurance market—a variety of tax, economic, and commercial benefits, including access to reinsurance markets.

[9]     *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. A:  "Deposition: Willis Account Manager, Dan Hawver," at 8.

[10]    A third party claims administrator is an entity or person hired to process claims for an insured.

[11]    *See* Willis's Motion for Summary Judgment [Doc. # 79], at 5.

[12]    *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. E:  "Deposition: Willis's Executive V.P. for Claims, Butch Marros," at 127; *see also id.*, Exh. F: "WASC Overview."

[13]    The record contains a suggestion that ASC was, at least for some time, owned by Willis, or was otherwise closely associated with Willis.  *See* Willis's Motion for
(continued...)

ASC's responsibilities extended to claims arising on or after July 1, 2003, but included also "certain liability files with loss dates prior to July 1, 2002, as assigned by" Coachmen.[14]

In March 2004, Coachmen was joined as a defendant in a Texas state court lawsuit for damages caused by a January 2001 fire in a Coachmen-manufactured trailer (the "Brashears lawsuit"). The plaintiffs in the state case alleged they suffered severe burns and disfigurement. On March 19, 2004, Coachmen notified CNA of the lawsuit and sent CNA a copy of the pertinent Complaint.[15] Coachmen sent a copy of the notification letter and state court Complaint to ASC and Willis.[16] Coachmen noted

---

[13]     (...continued)
Summary Judgment [Doc. # 79], Exh. A: "Deposition: Coachmen CEO, Richard Lavers," at 345, 351; Coachman's Response & Cross-Motion [Doc. # 121], Exh. F: "WASC Overview." Willis admits to having some degree of supervision over ASC's operations. *See id.*, Exh. A: "Deposition: Willis Account Manager Daniel Hawver," at 158–61; Willis's Reply & Response [Doc. # 105], at 9.

[14]     *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. F: "ASC Claim Service Agreement," at 1, ¶ 1 ("ASC agrees . . . [t]o assume handling of workers['] compensation claims with loss dates prior to July 1, 2003 and certain liability files with loss dates prior to July 1, 2002 as assigned by [Coachmen].").

[15]     The CNA policy was an "occurrence" policy, meaning that coverage extended to any losses occurring during the coverage period. Because the Brashears were injured in January 2001, Coachmen's CNA policy was implicated. *See id.*, Exh. B1: "Brokerage Proposal: 2001-2002," at Bates No. W001337.

[16]     It is not clear whether Coachmen paid applicable fees to have ASC handle the Brashears claim. However, ASC informed Coachmen's outside counsel that it was "the third party administrator assigned to th[e Brashears] claim on behalf of Coachmen Industries." *See id.*, Exh. G: "March 2004 Letter to Coachmen's Outside
(continued...)

in the letter that "[i]t [was] too early to tell whether the claims [could] be settled within [Coachmen's] self-insured retention . . . ."[17] Coachmen further wrote that "[i]t [was] not Coachmen's intent to cede direction of the defense or to tender the self-insured limit to [CNA] at th[at] time," as it did not yet appear that Coachmen would need to make a claim for payment from CNA.[18] However, Coachmen stated that "if [the recipients] would like to be copied with [Coachmen's] counsel's reports . . . Coachmen ha[d] authorized its counsel to cooperate . . . ."[19] Pursuant to Coachmen's representations, ASC requested that it be copied on all reports involving the Brashears lawsuit.[20]

More than a year later, on April 21, 2005, Coachmen received a multi-million dollar demand letter from the Brashears and subsequently sent a letter to ASC advising that the primary CNA insurance policy would likely be too small to cover a realistic settlement of the Brashears lawsuit. Coachmen stated that "[the] correspondence [should] serve as notice to [Coachmen's] excess carriers of the

---

[16]    (...continued)
Counsel from ASC."

[17]    *See id.*, Exh. B2:  "Letter to CNA Insurance Co."

[18]    *Id.*

[19]    *Id.*

[20]    *See id.*, Exh. G:  "March 2004 Letter to Coachmen's Outside Counsel from ASC."

potential liability involved with [the] case."[21]  ASC acknowledged its receipt of this notice on April 22, 2005, and that same day contacted Willis to request contact information for the excess carriers who had policies with Coachmen at the time of the 2001 fire.  According to an email exchange between ASC and Willis, Willis referred ASC to a Willis subsidiary, Stewart Smith,[22] which Willis apparently claimed was Coachmen's 2001 broker.  Upon being contacted by ASC, Stewart Smith allegedly assumed responsibility for reporting the Brashears lawsuit to Coachmen's excess insurance carriers,[23] and sent notice of the lawsuit to two companies, ACE USA ("ACE") and St. Paul Travelers Insurance ("St. Paul").  However, neither ACE nor St. Paul was potentially implicated by the Brashears claim.[24]

Despite Coachmen's request that all excess carriers be notified of the Brashears lawsuit, Gulf's claims department did not receive notification until April 29, 2005, the

---

[21]    *See id.*, Exh. J:  "April 2005 Letter to ASC from Coachmen."

[22]    *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. A:  "Deposition: Willis Account Manager, Dan Hawver," at 31, 37.  Stewart Smith has since been sold. *Id.* at 31.

[23]    *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. N:  "Emails from ASC to Willis, Stewart Smith, and Coachmen."  An email sent to a representative at Stewart Smith from ASC states:  "Per our conversation today [April 22, 2005], I understand that you will report this case to the several layers of coverage that may be exposed in this matter."

[24]    *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. Z:  "Email from Stewart Smith to Willis"; Exh. AA:  "Excess Carrier Notifications."

Friday before the Brashears trial was to commence.[25]  Gulf quickly denied coverage, claiming that it was prejudiced by the late notice and referencing the contractual requirement that it be given prompt notice of liability claims such as those involved in the Brashears lawsuit.  The parties in the Brashears lawsuit subsequently settled for $5,000,000 after a court-ordered mediation.  Neither Gulf nor ASC participated in the mediation.[26]

Coachmen thereafter sued Gulf, claiming under various theories that Gulf improperly denied coverage.  *See Coachmen Indus., Inc. v. Gulf Ins. Co.*, No. C-05-CV-0264 (S.D. Tex.—Corpus Christi Div. March 16, 2006).  Coachmen argued that any delay in notification was not prejudicial to Gulf.  In March 2006, Coachmen and Gulf settled these claims for $2,875,000.[27]

Shortly after settling with Gulf, Coachmen filed this suit against ASC, accusing the company of negligence, breach of fiduciary duty, breach of contract, and

---

[25]   In fact, it was Coachmen itself that ultimately contacted Gulf.  *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. I:  "Deposition: Coachmen In-House Counsel, Sandra L. Kennedy," at 212; Plaintiff's Second Amended Complaint [Doc. # 56], ¶ 12.

[26]   Coachmen alleges, but ASC disputes, that Gulf "acknowledged that had it received notice of the Brashears lawsuit on either April 20, 2005[,] or April 22, 2005, it would not have denied coverage, would have investigated the claim, and would have participated in the mediation of the Brashears lawsuit that took place on May 3, 2005."  Plaintiff's Second Amended Complaint [Doc. # 56], ¶ 17.

[27]   *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. A:  "Deposition: Coachmen CEO, Richard Lavers," at 372.

violations of Texas insurance law.  ASC subsequently joined Willis as a "responsible third party" and Coachmen thereafter asserted breach of contract, negligence, and insurance law claims against Willis as well.  Coachmen and ASC have since settled their dispute.  Willis and Coachmen, the sole remaining parties, have variously moved for summary judgment on all claims.

Late in this litigation, choice of law questions were raised.  The Court concluded that Illinois law applies to Coachmen's breach of contract claim, that the parties waived application of law other than that of Texas as to Coachmen's negligence claim, and that Willis is not susceptible to liability under the Texas Insurance Code.[28]  Accordingly, Illinois law governs resolution of Coachmen's breach of contract claim, Texas law governs resolution of the negligence claim, and Coachmen's insurance code claims have been dismissed.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case for which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*,

---

[28]    *See* Memorandum and Order of April 28, 2008 [Doc. # 152].

477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).   In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P.  56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the non-moving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak*, 953 F.2d at 913).  However, if the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response.  *ExxonMobil Corp.*, 289 F.3d at 375.

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th

Cir. 1998). Instead, the non-moving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the non-movant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted); *see also De la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 501 (5th Cir. 2005).

## B.   Contract Interpretation

Under Texas contract law, which—unless otherwise noted—the parties concede is the same as Illinois law for all purposes relevant to this suit,[29] the primary concern of the court in construing a written contract is to ascertain and give effect to the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Ervay, Inc. v. Wood*, 373 S.W.2d 380, 384 (Tex. Civ.

---

[29]     *See supra* note 3.

App.—Dallas 1963, writ ref'd n.r.e.); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 354 (5th Cir. 2008).  Courts are directed to examine the entire writing and give effect to all provisions of the contract so that none are rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951); *see MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1998) .  No single provision taken alone is to be given controlling effect.  *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962); *see Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *cf. TIG Speciality Ins. Co. v. Pinkmonkey.com, Inc.*, 375 F.3d 365, 371 (5th Cir. 2004).

"If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker*, 650 S.W.2d at 393; *see also Roman v. Roman*, 193 S.W.3d 40, 50 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *DeWitt County Elec. Co-op, Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)).  "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).  "Terms are given 'their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or

different sense.'"  *Weingarten Realty Investors v. Albertson's, Inc.*, 66 F. Supp. 2d

825, 838 (S.D. Tex. 1999) (quoting *Heritage Resources, Inc. v. NationsBank*, 939

S.W.2d 118, 121 (Tex. 1996)).  Applying that rule, "[a]n ambiguity exists only if the

language is susceptible to two or more reasonable interpretations." *Am. Mfrs. Mut.

Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) (citing *Kelley-Coppedge, Inc.

v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998)). "A term is not ambiguous

because of a simple lack of clarity." *DeWitt County Elec. Co-op*, 1 S.W.3d at 100

(citing *Universal C.I.T. Credit*, 243 S.W.2d at 157). "Nor does an ambiguity arise

merely because parties to an agreement proffer different interpretations of a term."

*Id.* (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)).

The parol evidence rule "precludes consideration of extrinsic evidence to

contradict, vary[,] or add to the terms of an unambiguous written agreement absent

fraud, accident[,] or mistake." *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 369 (Tex.

App.—Houston [14th Dist.] 2000, writ denied).  Thus, "[o]nly where a contract is first

determined to be ambiguous may the court[] consider the parties' interpretation and

admit extraneous evidence to determine the true meaning of the instrument. *Nat'l

Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) (internal citations

omitted); *see also Jacobson v. DP Partners Ltd. P'ship*, 245 S.W.3d 102, 106 (Tex.

App.—Dallas 2008, no pet.) ("Parol evidence that varies or contradicts the express

terms of the written agreement is not admissible."). "Parol evidence is not admissible for the purpose of creating an ambiguity." *Id.*, *see also Kelley-Coppedge, Inc.*, 980 S.W.2d at 464. In considering extraneous evidence, the court may properly consider "'the acts and conduct of the parties themselves, including acts done in the course of performance,'" as an indication of "'the construction that the parties themselves put on the contract . . . .'" *Weingarten Realty Investors*, 66 F. Supp. 2d at 838 (quoting *Ervay, Inc.*, 373 S.W.2d at 384); *see also Texas v. Am. Tobacco Co.*, 463 F.3d 399, 404 n.9 (5th Cir. 2006); *Eog Res. v. Hanson Prod. Co.*, 94 S.W.3d 697, 701 (Tex. App.—San Antonio 2002, no pet.); *Trinity Universal Ins. Co. v. Ponsford Bros.*, 423 S.W.2d 571, 575 (Tex. 1968) (citing *Lone Star Gas Co. v. X-Ray Gas Co.*, 164 S.W.2d 504 (Tex. 1942)).

When a contract is found to contain an ambiguity, interpretation of the instrument may raise questions of fact concerning the parties' intentions. *See Coker*, 650 S.W.2d at 394 (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980)). However, "'in case of a reasonable doubt as to which of two constructions best accords with the intent of the parties, that construction should prevail which is least favorable to the party who prepared the instrument.'" *Weingarten Realty Investors*, 66 F. Supp. 2d at 839 (quoting *Ervay, Inc.*, 373 S.W.2d at 384); *see also Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 335 (Tex. 1983) (citing *Republic Nat'l Bank*

*v. Nw. Nat'l Bank*, 578 S.W.2d 109, 115 (Tex. 1978)).

Regardless whether a contract is deemed ambiguous, the burden of proof as to each element of a contract claim remains at all times on the plaintiff. *See Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 719 (5th Cir. 1995); *York Group, Inc. v. Horizon Casket Group, Inc.*, 459 F. Supp. 2d 567, 571–72 (S.D. Tex. 2006); *see also Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex. App.—El Paso 2000, no pet.).

## III.   <u>ANALYSIS</u>

### A.   <u>Breach of Contract</u>[30]

In asserting a breach of contract claim against Willis, Coachmen alleges that:

> Plaintiff and Defendant Willis entered into a contract whereby . . . Willis agreed to perform services as a broker, including but not limited to, an agreement to conduct claims filing, claims oversight, report claims to excess carriers on behalf of Plaintiff, notify Coachmen of any endorsements to policies procured on Coachmen's behalf by Willis, and coordinate and oversee the work of third-party administrators."[31]

Coachman claims that Willis breached these contractual obligations, thus causing Coachmen monetary damages.[32]

In order to prevail on a breach of contract claim, a plaintiff must establish: "(1)

---

[30]    Both Coachmen and Willis have moved for summary judgment on this claim.

[31]    Plaintiff's Second Amended Complaint [Doc. # 56], ¶ 20.

[32]    *Id.*

the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Valero Mktg. & Supply Co. v. Kalama Int'l, LLC*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *see also Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003); *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001).[33] Willis concedes the second element, but argues that Coachmen has failed to identify the existence of a valid contract with Willis and cannot demonstrate that Willis breached any contractual obligations consistent with Coachmen's claims.[34]

### 1.    Existence of a Valid Contract

The parties' first point of contention concerns the existence or non-existence of a contract relevant to this lawsuit.  Contrary to Coachmen's assertion that it had yearly service contracts with Willis—at least three of which are potentially involved in this matter—Willis asserts that it only provided "brokerage proposals" to Coachmen and that these proposals are not legally enforceable contracts.  Willis

---

[33]    Again, the parties concede that there are no relevant conflicts between Illinois and Texas contract law.  *See supra* note 3.

[34]    Willis additionally argues that any damage to Coachmen on account of these alleged breaches was caused by Gulf's improper decision to deny coverage on the Brashears claim and not by any failure on the part of Willis.  However, neither party has focused arguments on the causation prong of the breach of contract analysis.  Accordingly, the Court does not reach whether this element of Coachmen's breach of contract claim is satisfied.

further claims that if these proposals are deemed "contracts," the only one relevant to this suit is the proposal governing the 2001-2002 insurance period, which does not include any language suggesting that Willis owed Coachmen any responsibility to oversee claims.

Parties form a binding contract when there is "(1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Roman*, 193 S.W.3d at 50 (citing *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555–56 (Tex. App.—Houston [14th Dist.] 2002, no pet.)). "Consideration is also a fundamental element of every valid contract." *Id.* (citing *Turner-Bass Assocs. of Tyler v. Williamson*, 932 S.W.2d 219, 222 (Tex. App.—Tyler 1996, writ denied)). Although neither Coachmen nor Willis direct their arguments concerning the existence or non-existence of a contract to these factors, a review of the relevant documents indicates that, for at least two of the three insurance periods at issue in this suit, the factors have been met; Coachmen and Willis entered legally enforceable contracts.[35]

---

[35]   Coachmen also suggests that it had various oral contracts with Willis. Although the existence of an oral contract may be proven by both circumstantial and direct evidence, that evidence must demonstrate that all the attributes of contract formation were present: offer, acceptance, a meeting of the minds, and expression of the terms with "sufficient certainty so that there will be no doubt what the parties intended."

(continued...)

### a.    *Brokerage Proposal: 2001-2002*

For the May 2001 through May 2002 insurance period—during which time the Brashears' injuries occurred—Willis brokered for Coachmen a variety of insurance polices on the traditional insurance market, as reflected in the 2001-2002 "Brokerage Proposal," which consists primarily of overviews of the various policy options recommended by Willis.[36]   For that period, Willis earned a commission on the premiums paid by Coachmen for the policies brokered by Willis.[37]

However, while the parties do not dispute that Coachmen, in fact, ultimately purchased insurance through Willis for the 2001-2002 period, the document itself does not demonstrate any obligation upon Coachmen, such as a duty to procure insurance through Willis.  Nothing in the proposal prevented Coachmen from declining the policies suggested by Willis, thus leaving Willis without any recompense for its

---

[35]    (...continued)
*See Harris v. Balderas*, 27 S.W3d 71, 77 (Tex. App.—San Antonio 2000, pet. denied) (citing *PGP Gas Prods. v. Reserve Equip., Inc.*, 667 S.W.2d 604, 607 (Tex. App.—Austin 1984, writ ref'd n.r.e.); *Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App.—San Antonio 1999, pet. denied)); *see also Komet v. Graves*, 40 S.W.3d 596, 601 (Tex. App.—San Antonio 2001, no pet.).  Coachmen offers no evidence of communications between itself and Willis indicative of the formation of oral contracts and instead relies solely on strained interpretations of deposition testimony.  Coachmen's arguments fail to establish the existence of oral contracts.

[36]    *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. B1: "Brokerage Proposal: 2001-2002."

[37]    *See id.*, Exh. B: "Affidavit: Willis's Executive V.P., Daniel Hawver," ¶ 7; *see also* Coachmen's Response & Cross-Motion [Doc. # 121], at 20–21.

efforts.  Further, Coachmen has not pointed to any offer by either itself or Willis to enter into an agreement, much less acceptance in compliance with the terms of the offer by the offeree and consideration.  Accordingly, the Court cannot conclude that the 2001-2002 Brokerage Proposal reflects a contract of sufficient definiteness to constitute a legally enforceable agreement.

### b.   *Brokerage Proposal: 2003-2004*

For the July 2003 to July 2004 insurance period[38]—during which time Coachmen was named as a defendant in the Brashears lawsuit and notified Willis of the potential claim—Willis brokered for Coachmen insurance policies both within and outside of the Alembic captive, as evidenced by the 2003-2004 Brokerage Proposal.[39] Unlike the 2001-2002 Brokerage Proposal, the document executed for the 2003-2004 period clearly evinces a contract for services, for which Willis charged and received compensation, *i.e.*, a flat fee.[40]  Willis drafted, and Coachmen signed, a document intended "to record [Coachmen and Willis's] mutual understanding regarding [their] professional relationship and the services which [Willis] agreed to provide" in

---

[38]    It is not clear from the record why Coachmen's insurance periods changed from May through May to July through July.

[39]    *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. AG: "Brokerage Proposal: 2003-2004."

[40]    *See id.* at Bates No. COACH 37695, 37826–34.

exchange for Coachmen's payment of Willis's service fee.[41]  The document is drafted in contract terms, speaking to "terms and conditions," mutual "commitments," and "breach"[42] and constitutes a legally enforceable contract.

### c.    *Brokerage Proposal: 2004-2005*

For the July 2004 to July 2005 insurance period—during which time the Brashears made the multi-million dollar demand on Coachmen—Willis again brokered for Coachmen insurance policies both within and outside of the Alembic captive, as evidenced by the 2004-2005 Brokerage Proposal.[43]  Like the 2003-2004 Brokerage Proposal, this document clearly reflects a legally enforceable contract for services, memorialized in a document nearly identical to that signed by the parties for the 2003-2004 period.[44]

### 2.    **Alleged Breaches of Contractual Obligations**

### a.    *Notification of Insurance Policy Terms*

The first contractual breach claimed by Coachmen concerns Willis's alleged failure to properly notify Coachmen of the endorsement to the Gulf policy requiring

---

[41]    *Id.* at Bates No. COACH 37827.

[42]    *Id.* at Bates No. COACH 37827–29.

[43]    *See* Willis's Motion for Summary Judgment [Doc. # 79], Exh. B4: "Brokerage Proposal: 2004-2005."

[44]    *See id.* at Bates No. W001527–31.

"prompt" notification of claims involving burns or disfigurement.  Willis appears to argue that it had no contractual obligation to expressly highlight every provision of every policy procured on Coachmen's behalf.  Willis contends that its duties with respect to this alleged breach were fulfilled when, in advance of the 2001-2002 insurance period, it presented an overview of the policy coverage and exclusions to Coachmen, received Coachmen's assent to obtain coverage from Gulf, and subsequently secured and transmitted the Gulf policy to Coachmen.

Willis's position is well-taken.  Even assuming *arguendo* that the 2001-2002 Brokerage Proposal constituted a legally enforceable agreement, Coachmen has not pointed to any contractual provision in it, or any of the other contracts potentially implicated in this case, establishing a contractual duty on Willis's part to highlight every possible policy provision that might be relevant to a future claim.  "[A]n insurance [broker] who undertakes to procure insurance for another owes a duty to a client to use reasonable diligence in attempting to place the requested insurance and to inform the client promptly if unable to do so."  *May v. United Servs. Ass'n*, 844 S.W.2d 666, 669 (Tex. 1993). "[L]iability will usually depend on evidence that the [broker] has induced his client to rely on his or her performance and that the client reasonably, but to his detriment, assumed that he was insured against the risk which caused the loss." *Aspen Specialty Ins. Co. v. Muniz Eng'g, Inc.*, 514 F. Supp. 2d 972,

982 (S.D. Tex. 2007) (citing *Moore v. Whitney-Vaky Ins. Agency*, 966 S.W.2d 690, 692 (Tex. App.—San Antonio 1998, no pet.).   An insurance broker may not misrepresent the terms of an insurance policy.  *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 384 (Tex. 2000).  However, "an insured has a duty to read and be familiar with the terms of his own policy and is bound to them whether he has read them or not."  *Aspen Specialty Ins.*, 514 F. Supp. 2d at 983 (citing *Heritage Manor of Blaylock Props., Inc. v. Petersson*, 677 S.W.2d 689, 691 (Tex. App.—Dallas 1984, writ ref'd n.r.e.)); *see Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 300 (Tex. App.—El Paso 1996), *aff'd*, 966 S.W.2d 482 (Tex. 1998).

In this case, Coachmen has not alleged that Willis misrepresented the terms of the Gulf policy or that the policy failed to provide the coverage Coachmen requested or expected.  Instead, Coachmen complains that Willis did not specifically point out Endorsement 16, which imposed on Coachmen a duty to promptly notify Gulf of certain claims.  Coachmen, as the insured, "had a duty to read the [Gulf] policy . . . [and is] charged with knowledge of its conditions and coverage."  *Heritage Manor*, 677 S.W.2d at 691 (citing *Rodgers v. Ins. Co. of Penn.*, 513 S.W.2d 113 (Tex. Civ. App.—Ft. Worth 1974, writ ref'd n.r.e.); *Ind. & O. Live Stock Ins. Co. v. Keiningham*, 161 S.W. 384 (Tex. Civ. App.—Dallas 1913, writ ref'd)); *see Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 744, 745 (S.D. Tex. 1998); *see also E.R. Dupuis*

*Concrete Co. v. Penn Mut. Life Ins. Co.*, 137 S.W.3d 311, 320 (Tex. App.—Beaumont 2004, no pet.) (distinguishing actionable claims in which a broker misrepresents the meaning of a policy term from unactionable claims in which a broker failed to explain a term that was addressed in the policy); *Ruiz v. Gov't Employees Ins. Co.*, 4 S.W.3d 838, 841 (Tex. App.—El Paso 1999, no pet.); *Amarco Petroleum, Inc. v. Tex. Pac. Indem. Co.*, 889 S.W.2d 695, 699 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *cf. Moore*, 966 S.W.2d at 692–93; *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962) ("[P]arties to a contract have an obligation to protect themselves by reading what they sign. Unless there is some basis for finding fraud . . . , they may not excuse themselves from the consequences of failing to meet that obligation because they unwisely trusted the other party."). Coachmen has identified no contractual language relieving it of the duty to read its own insurance contract and instead placing a burden on Willis to emphasize certain contractual provisions. Accordingly, Willis is entitled to summary judgment on this breach of contract claim.

### b. *Claims Handling*

Coachmen next alleges that Willis breached its contractual obligations with respect to claims handling in that Willis failed to properly report the Brashears claim to Gulf when it received notice of the claim in March 2004.[45] Willis responds first,

---

[45]    In its Second Amended Complaint [Doc. # 56], Coachmen alleges that Willis
(continued...)

that because the Brashears claim implicated the insurance policies in place with

Coachmen in 2001, only the 2001-2002 Brokerage Proposal—which does not include

any language regarding claims handling—is relevant to this claim.   Accordingly,

Willis argues that it owed no duties to Coachmen with regard to the Brashears claim

after the end of the 2001-2002 insurance period.   Second, Willis argues that if any

later brokerage proposals are relevant to this breach of contract claim, any references

therein to "claims handling" refer solely to insurance claims covered by the Alembic

captive.   Finally, Willis argues that this claim is barred by waiver or estoppel.[46]

The Court agrees that the 2001-2002 Brokerage Proposal contains no language

obligating Willis to handle claims for Coachmen.   However, the Court rejects Willis's

argument that its contracts with Coachmen were "occurrence" contracts by virtue of

the fact that the insurance policies brokered were "occurrence" policies.   Willis's

2003-2004   and   2004-2005   contracts   with   Coachmen—which   Willis

drafted—expressly contemplate that certain duties would not necessarily be tied to the

---

[45]      (...continued)
        breached its contract with Coachmen when it failed to "conduct claims filing, claims
        oversight, [and] report claims to excess carriers.  *Id.* ¶ 20.  It is not clear from the
        Complaint whether Coachmen is alleging that Willis owed it a duty to report the
        Brashears claim to Gulf in March 2004 *and/or* that Willis owed such duties when
        Coachmen received the multi-million dollar demand letter from the Brashears in April
        2005.  However, Coachmen's summary judgment briefing on this claim focuses solely
        on Willis's alleged failures in March 2004.  *See* Coachmen's Response & Cross-
        Motion [Doc. # 121], at 24–25.  The Court construes the claim accordingly.

[46]      *See* Willis's Supplemental Memorandum on Conflicts of Law [Doc. # 155], at 5–8.

policy periods of the brokered insurance policies. Indeed, these two contracts anticipate that claims handling services would occur at the time the *claim* arises, as opposed to when the underlying injury may occur. Both the 2003-2004 and the 2004-2005 Brokerage Proposals state:

> Our obligation to render services under this agreement ceases at the end of the term or on the effective date of termination of our relationship, whichever is sooner. . . . Claims may arise many years after our relationship ends. Such claims are normally handled by the insurance broker serving you at the time the claim arises. However, we are willing to consider providing claims-related services after the term or termination of this agreement for mutually agreed additional compensation.[47]

First, this language confirms that Willis agreed to provide certain claims handling services for Coachmen. Moreover, by stating that "claims handling" services are generally provided by the broker in place when the claim arises, and not by the former broker who placed the insurance implicated by the claim, the language establishes that Willis's service contracts with Coachmen were not intended to be occurrence contracts for purposes of claims handling. This language also establishes that the 2003-2004 Brokerage Proposal is relevant to this breach of contract claim.

The Court also rejects Willis's position that its obligations with regard to claims handling only extended to Alembic claims. Willis devotes much of its summary

---

[47] *See id.*, Exh. AG: "Brokerage Proposal: 2003-2004," at Bates No. COACH 37828; Willis's Motion for Summary Judgment [Doc. # 79], Exh. B4: "Brokerage Proposal: 2004-2005," at Bates No. W001528.

judgment briefing to arguing that its services varied based on whether a claim was an "Alembic" or "non-Alembic" claim.  However, nothing in the 2003-2004 Brokerage Proposal states, or even implies, that the claims handling services Willis agreed to provide depended on the insurer or particular insurance policy implicated by a claim: The Brokerage Proposal includes details about the Alembic Program and about the insurers from which Willis recommended Coachmen purchase its non-Alembic policies.  The "Premium Summary" included in the service agreement lists both the Alembic and non-Alembic premiums without any relevant distinction.[48]  And, most significantly, the actual "Fee Service Agreement" states that Willis "shall place the [listed] policies or lines of insurance coverage at the direction of [Coachmen] and shall provide services [such as "brokerage placement and servicing" and "oversight and guidance of . . . excess insurance claims"] in regard to [those] policies in accordance with normal industry standards and practices for insurance producers" without any distinction made for Alembic versus non-Alembic claims.[49]

Nevertheless, the meaning of "claims handling" is ambiguous and genuine questions of fact exist as to the *scope* of Willis's claims handling obligations.  For instance, "normal industry standards and practices" regarding claims "oversight and

---

[48]   *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. AG: "Brokerage Proposal: 2003-2004," at Bates No. COACH 37777–80.

[49]   *Id.* at Bates No. COACH 37830, 37834.

guidance" are undefined and unclear terms in the 2003-2004 agreement.  In addition, Willis raises other arguments that preclude summary judgment.

Willis argues that because Coachmen contracted with ASC to perform claims handling, it was ASC, and not Willis, that bore responsibility for reporting the Brashears claim to Gulf in March 2004.  Although there is no language in the 2003-2004 Brokerage Proposal supporting this position and, indeed, it appears from that document that ASC was charged with handling *Alembic* claims,[50] it may be that ASC's and Willis's duties were neither mutually exclusive, nor fully overlapping.  Thus, it could be that Willis's responsibilities in regard to claims handling were not as wide-ranging as Coachmen alleges.  This matter cannot be resolved by the Court on summary judgment and requires a trial.

Similarly, Willis argues that because Coachmen never asked for Willis's assistance with regard to the Brashears claim, Coachmen absolved Willis of any responsibility for reporting the matter, and thereby waived any breach of contract claim arising from Willis's failure to do so.[51]  This is another issue that cannot be resolved on summary judgment.  On the one hand, if Willis had a contractual duty to notify Gulf of the Brashears claim, the fact that Coachmen did not expressly request

---

[50]     *See id.* at Bates No. COACH 37711.

[51]     *See* Willis's Supplemental Brief on Conflicts of Law [Doc. # 155], at 5–8.

assistance may be of no consequence.  On the other hand, if "normal industry standards and practice" are that an insured must request notification assistance, then Willis may prevail on its argument that Coachmen has waived its claim.  Accordingly, neither party is entitled to summary judgment on Coachmen's assertion that Willis breached its contractual obligation to report the Brashears claim to Gulf.

### c.    *Oversight of ASC*

Finally, Coachmen alleges that Willis breached its contract with Coachmen when it failed to adequately coordinate with and oversee ASC regarding the handling of the Brashears claim in April 2005.  Coachmen asserts that once ASC was expressly asked to put excess carriers on notice of the Brashears claim via Coachmen's April 2005 letter to ASC, Willis was obligated to ensure that all such carriers were properly notified.  Instead, Coachmen claims that Willis breached the 2004-2005 Brokerage Proposal when it provided ASC with incorrect information regarding Coachmen's insurers and failed to follow up with ASC to ensure that notification was properly provided to all relevant insurers.

The 2004-2005 Brokerage Proposal, which documents Coachmen's Alembic and non-Alembic insurance coverage for the July 2004 to July 2005 period, states that Willis will, "in accordance with normal industry standards and practices for insurance producers[,] . . . [c]oordinate Third Party Administration services/contracts and

over[see] their work."[52]  Again, Willis argues that any obligations it had to oversee ASC were limited to ASC's work on Alembic claims.  Again, Willis's contract with Coachmen evinces no such distinction.  And again, questions of fact exist as to what "normal industry standards and practice" are vis-a-vis a broker's obligations to oversee the work of third party administrators.  Accordingly, neither party is entitled to summary judgment on Coachmen's claim that Willis breached its contractual obligation to oversee the work of Coachmen's TPA.

**B.** **Negligence**[53]

Coachmen, in its Second Amended Complaint, alleges that Willis breached its "duty to exercise reasonable care in performing services as . . . an insurance broker."[54] Specifically, Coachmen claims that Willis negligently "failed to give proper notice to Gulf of the Brashears lawsuit," and "failed to provide ASC with the correct information to assist ASC in giving proper notice to Gulf of the Brashears lawsuit."[55] Coachmen asserts two theories of relief for this claim—common law negligence and negligence arising from a "voluntary undertaking."

---

[52]    Willis's Motion for Summary Judgment [Doc. # 79], Exh. B4: "Brokerage Proposal: 2004-2005," at Bates No. W001531.

[53]    Only Willis has moved for summary judgment on this claim.

[54]    Second Amended Complaint [Doc. # 56], ¶¶ 21, 22.

[55]    *Id.* ¶ 22.

### 1.    Common Law Negligence

Texas does not recognize a general cause of action for "negligent performance of a contract." *Entergy Gulf States, Inc. v. Akrotex, Inc.*, 40 S.W.3d 201, 203 (Tex. App.—Beaumont 2001, no pet.). Thus, where parties to a lawsuit have contractual obligations to one another, the Texas Supreme Court has established a two-part test to determine whether a plaintiff may assert a tort claim alongside a breach of contract claim. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *see also Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992); *Willis v. Donnelly*, 118 S.W.3d 10, 30–31 (Tex. App.—Houston [14th Dist.] 2003, pet. granted); *Am. Nat'l Ins. Co. v. Int'l Bus. Mach., Inc.*, 933 S.W.2d 685, 686 (Tex. App.—San Antonio 1996, writ denied).

A court must first look to whether the defendant's conduct "would give rise to liability independent of the fact that a contract exists between the parties." *DeLanney*, 809 S.W.2d at 494.  "If the action depends entirely on pleading and proving the contract in order to establish a duty, the action remains one for breach of contract only, regardless of how it is framed by the pleadings." *OXY USA, Inc. v. Cook*, 127 S.W.3d 16, 20 (Tex. App.—Tyler 2003, pet. denied).  The court then looks to the nature of the injury.  *DeLanney*, 809 S.W.2d at 495.  "When the injury is only the economic loss to the subject of a contract itself[,] the action sounds in contract alone."

*Id.*  Thus, "in order for a tort duty to arise out of a contractual duty, *i.e.*, a negligent

failure to perform a contract, the liability must arise 'independent of the fact that a

contract exists between the parties'; the defendant must breach a duty imposed by law

rather than by the contract." *Willcox v. Am. Home Assurance Co.*, 900 F. Supp. 850,

863 (S.D. Tex 1995) (quoting *DeLanney*, 809 S.W.2d at 494; citing *Janicek v. KIKK,

Inc.*, 853 S.W.2d 780, 781–82 (Tex. App.—Houston [14th Dist.] 1993, writ denied);

*River Consulting Inc. v. Sullivan*, 848 S.W.2d 165, 170 (Tex. App.—Houston [1st

Dist.] 1992, writ denied)).

In this case, Coachmen claims that Willis owed a duty to exercise reasonable

care in performing services as an insurance broker.[56]  Coachmen alleges that Willis

breached this duty by "fail[ing] to give proper notice to Gulf of the Brashears

Lawsuit" and by "fail[ing] to provide ASC with the correct information to assist ASC

in giving proper notice to Gulf."[57]  Although Coachmen argues that the duties

allegedly breached arise from the "long-standing" relationship it had with Willis,[58]

Coachmen implicitly concedes that the source of these alleged duties is actually its

contractual agreements with Willis, rather than any extracontractual legal duty.

---

[56]     Second Amended Complaint [Doc. # 56], ¶¶ 21, 22.

[57]     *Id.*

[58]     *See* Coachmen's Response & Cross-Motion [Doc. # 121], at 29.

Indeed, Coachmen's putative negligence claim closely tracks its breach of contract claim.  In its breach of contract claim, Coachmen alleges that it and Willis:

> entered into a contract whereby . . . Willis agreed to perform services as a broker, including but not limited to[:] an agreement to conduct claims filing, claims oversight, report claims to excess carriers on behalf of [Coachmen], notify Coachmen of any endorsements to policies procured on Coachmen's behalf by Willis, and coordinate and oversee the work of third-party administrators.[59]

Coachmen then alleges that Willis was "negligent" for failing to "exercise reasonable care" in performing its services as a broker, including its alleged failure to properly report claims and coordinate the work of ASC.[60]  In addition, Coachmen has argued that "[c]learly, . . . there was a contract for services between Coachmen and Willis . . . .  This is the contract underlying the claim against Willis for failing to supervise ASC and, when asked, to report excess claims."[61]  Thus, by its own admission, Coachmen's negligence claim against Willis—regardless of how it is framed in the pleadings—is premised on the alleged contractual obligations between the parties.

---

[59]   Second Amended Complaint [Doc. # 56], ¶ 20; *see also* Coachmen's Response & Cross-Motion [Doc. # 121], at 16 (asserting that Willis's contractual duties were "not limited to 'claims handling' and notifying excess carriers," but also to "oversee[ing] ASC in its duties to Coachmen (specifically, notification of excess carriers)").

[60]   Second Amended Complaint [Doc. # 56], ¶ 22.

[61]   Coachmen's Response & Cross-Motion [Doc. # 121], at 19.

Substantively, Coachmen identifies no basis in tort for Willis's alleged duty to report claims or coordinate ASC's work and the Court can conceive of none. Coachmen's claims that Willis was to "act as a notifying agent of . . . claims that clients report to [it]," "assist" and "ensure" that "ASC was doing its job as to notification . . . of excess carriers," and "facilitate the reporting of a claim to an insurance carrier"[62] do not represent general legal duties owed by one person to another.[63] These responsibilities allegedly required of Willis—to the extent they exist at all—exist only because of the contractual relationship between Coachmen and Willis.

Moreover, courts have expressly refused to recognize a cause of action for negligent claims handling under Texas law. *Northwinds Abatement v. Employers Ins. of Wausau*, 258 F.3d 345, 352 (5th Cir. 2001) (citing *Higginbotham v. State Farm Mut. Auto Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997)); *United Servs. Auto. Ass'n v.*

---

[62]   *See id.*, at 30–31.

[63]   In its briefing on the pending motions for summary judgment, Coachmen cites a litany of alleged "higher duties" owed to it by Willis.  *See id.*  These are largely variations on Coachmen's claims that Willis owed it a common law duty to report, or oversee reporting of, claims to Coachmen's insurers.  To the extent they are not, however, they do not constitute actionable duties.  They were not alleged in Coachmen's Complaint, and claims cannot be raised for the first time in response to a motion for summary judgment.  *See Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 114 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the Court." (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990))).

*Pennington*, 810 S.W.2d 777, 783–84 (Tex. App.—San Antonio 1991, writ denied);

*see also French v. State Farm Ins. Co.*, 156 F.R.D. 159, 162 (S.D. Tex. 1994); *Justice*

*v. State Farm Lloyds Ins. Co.*, 246 S.W.3d 762, 765 (Houston [14th Dist.] 2008, no

pet.). "Negligent claims handling is subsumed into breach of contract except under

very limited circumstances." *Northwinds Abatement*, 258 F.3d at 352. In Texas, the

only common law duties regularly assumed by "an insurance agent [or broker] who

undertakes to procure insurance for another . . . [are] to use reasonable diligence in

attempting to place the requested insurance and to inform the client promptly if unable

to do so." *May*, 844 S.W.2d at 669; *see also Aspen Specialty Ins. Co. v. Muniz Eng'g,*

*Inc.*, 514 F. Supp. 2d at 982; *Critchfield v. Smith*, 151 S.W.3d 225, 230 (Tex.

App.—Tyler 2004, pet. denied). Coachmen's allegations do not implicate either of

these circumstances, *see, e.g.*, *Moore v. Whitney-Vakey Ins. Agency*, 966 S.W.2d at

692 (discussing an insurance agent's common law duties), and Coachmen has not

identified any other basis for recovery in tort under the facts presented here.[64]

---

[64]     Coachmen's reliance on *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d
695 (Tex. 2007), is misplaced. Coachmen argues that the case, which discusses when
a third party insurance claims administrator may be deemed a fiduciary of an insured,
establishes that Willis is a fiduciary of Coachmen. In fact, Coachmen claims in its
summary judgment briefing on its negligence claim against Willis, that "given this
new precedent, Coachmen now contends that [the] duties [owed to it by Willis] are
fiduciary in nature, but because . . . the pleadings [amendment] deadline has passed,
[Coachmen] will continue to couch these duties on a mere negligence standard unless
the Court later permits amendment of the Complaint." Coachmen's Response &
(continued...)

As to the second prong of the *DeLanney* test, there is no evidence that Coachmen is seeking damages against Willis that are separate and distinct from the damages sought for Willis's alleged breach of contract.  Although "a plaintiff is not precluded from asserting a tort cause of action solely because his damages are analogous to the damages sought in a contractual claim," *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 674 (Tex. App.—Houston [1st Dist.] 1996, no writ), "[w]hen the injury is only the economic loss subject to the contract itself, the action sounds in contract alone." *Entergy Gulf States, Inc.*, 40 S.W.3d at 203.

In this case, Coachmen has stated that it was able to recover in its suit against

---

64      (...continued)
        Cross-Motion [Doc. # 121], at 30 n.23.  However, as explained in note 63, *supra*, because Coachmen did not raise a breach of fiduciary duty claim against Willis in its Second Amended Complaint, the live pleading in this case, the claim is not properly before the Court.  *See Cutrera*, 429 F.3d at 114 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the Court."); *see also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("Breach of fiduciary duty claims are restricted to . . . plaintiffs who can establish the existence of a confidential or similar relationship that gives rise to a fiduciary duty. . . . [P]laintiffs must plead facts that . . . demonstrate that they fall within the circumscribed cases of individuals eligible to bring a claim.").  Indeed, Coachmen subsequently sought (but was denied) leave to file a third amended complaint, but did not attempt to raise a breach of fiduciary duty claim against Willis at that time.  *See* Motion for Leave to File a Third Amended Complaint [Doc. # 115], Exh. A: "Proposed Third Amended Complaint," at 9.  Moreover, during a pretrial hearing in this case, Coachmen expressly abandoned its breach of fiduciary claim, which was specifically alleged against former Defendant ASC.  *See* Hearing Minutes and Order [Doc. # 134].  To the extent Coachmen's arguments are now focused on establishing a breach of fiduciary duty claim against Willis, they are not viable in this suit.

Gulf $2.875 million of the $3.75 million it had to pay to settle the Brashears lawsuit.[65]

Coachmen filed this suit, seeking to recover $1.25 million,[66] which includes "policy proceeds from the Gulf Policy that should have been paid to Gulf but instead Plaintiff was forced to pay[,] attorneys' fees and expenses in the litigation with Gulf, time value of money paid to settle the Brashears lawsuit, court costs in the litigation with Gulf, attorneys fees, expenses and pre- . . . [and] post-judgment interest, and treble damages [for Defendants' alleged violations of the Texas insurance code]."[67] Coachmen claims that Willis's alleged negligence caused it "financial injuries."[68] However, Coachmen has not provided any argument or factual evidence demonstrating that such injuries are outside the scope of its economic losses from Willis's alleged breach of contract.

Based on the evidence presented by the parties, it is apparent that Coachmen is seeking to recoup the costs it incurred due to Willis's alleged failure to fulfill its

---

[65] *See* Coachmen's Response & Cross-Motion [Doc. # 121], at 14.  The Brashears lawsuit settled for $5 million.  However, the first $250,000 was paid by Coachmen pursuant to its "self-insured retention."  CNA, Coachmen's primary liability insurer paid the next $1 million.  *See id*., at 11; *see also* Willis's Motion for Summary Judgment [Doc. # 79], Exh. A: "Deposition:  Coachmen CEO, Richard Lavers," at 372–73.

[66] Presumably, given Coachmen's recent settlement with former Defendant ASC, Coachmen's damage demand is now less than the $1.25 million originally sought.

[67] *See* Second Amended Complaint [Doc. # 56], ¶ 28.

[68] *Id.* ¶¶ 21, 22.

contractual obligations to oversee claims handling.  In the absence of a common law duty on a insurance broker to perform claims handling, these costs can only be characterized as resulting from a contractual injury.  *See, e.g.*, *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *see also Ludlow v. DeBerry*, 959 S.W.2d 265, 276 (Tex. App.—Houston [14th Dist.] 1997, no writ).  Coachmen has not alleged any exemplary damages, much less demonstrated the existence of "a distinct tortious injury with actual damages."  *Jim Walter Homes*, 711 S.W.2d at 618; *see also Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 745 (Tex. 1986).  Thus, Coachmen has failed to satisfy this prong of the *DeLanney* test.

Having failed to identify any common law duties allegedly breached by Willis, Coachmen's common law negligence claim fails.  Accordingly, summary judgment for Willis on this theory is warranted.

## 2. Voluntary Undertaking Negligence

Coachmen alternatively claims that Willis assumed a common law duty to handle Coachmen's insurance claims when it allegedly "voluntarily undertook" to notify excess carriers of the Brashears lawsuit in April 2005.[69]  This theory of relief

---

[69]     This "voluntary undertaking" theory was never affirmatively asserted by Coachmen, but was instead first raised by former Defendant ASC in its response to Willis's Motion for Summary Judgment.  *See* ASC's Response to Willis's Motion for Summary Judgment [Doc. # 86].  Coachmen subsequently adopted ASC's arguments.
(continued...)

provides for recovery in tort for harms resulting from a defendant who "voluntarily undertakes . . . to render services to another . . . as necessary for the protection of the other's person or things." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839 (Tex. 2000) (quoting RESTATEMENT (SECOND) OF TORTS § 323 (1965)).[70] However, an open question under Texas law is whether recovery under this theory is available only for *physical* harms resulting from a defendant's voluntary undertaking.

Willis argues that because Coachmen only seeks recovery for "financial injury"

---

[69]     (...continued)
*See* Coachmen's Reply to Willis's Response to Coachmen's Cross-Motion for Summary Judgment [Doc. # 113], at 6. Coachmen appears to allege only that Willis "undertook" to place excess carriers on notice of the Brashears lawsuit. Coachmen has presented no argument or evidence suggesting that Willis also "voluntarily undertook" to supervise ASC in ASC's handling of the Brashears claim. Thus, given that the Court has concluded that Willis had no common law duty to supervise ASC, any negligence claim premised on such a duty is dismissed.

[70]     Section 323 of the Second Restatement of Torts states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if:

> (a)     his failure to exercise such care increases the risk of harm; or

> (b)     the harm is suffered because of the other's reliance upon the undertaking.

due to Willis's alleged negligence,[71] this theory should be rejected. *See Wal-Mart Stores, Inc. v. Lane*, 31 S.W.3d 282, 293 (Tex. App.—Corpus Christi 2000, pet. denied) (stating that cases recognizing negligence claims where one has "gratuitously" acted "refer to situations where bodily injury or injury to property belonging to the party is involved"); *Sibley v. Kaiser Found. Health Plan*, 998 S.W.2d 399, 403 (Tex. App.—Texarkana 1999, no pet.); *King v. Graham Holding Co.*, 762 S.W.2d 296, 300 (Tex. App.—Houston [14th Dist.] 1988, no writ.); *see also Stroud v. Meister*, 2001 U.S. Dist. LEXIS 2886, at *58 (N.D. Tex. Mar. 16, 2001) ("[Plaintiff] has suffered economic losses, not physical harm, and therefore cannot rely on voluntary undertakings . . . as a basis for a negligent supervision claim."). Coachmen, however, points to another line of cases that suggest that a plaintiff may recover on a voluntary undertaking theory for purely economic injuries. *See e.g.*, *Peterson v. Mut. Sav. Inst.*, 646 S.W.2d 327, 329 (Tex. App.—Austin 1983, no writ.) ("The rule of the Restatement has been applied to cases involving only economic injury . . . ."); *see also In re Magna Cum Latte, Inc.*, No. 07-31814, 2007 Bankr. LEXIS 3802, at *41 (S.D. Tex. Oct. 30, 2007); *cf. Cont'l Sav. Ass'n v. Sneed*, No. A-88-CA-844, 1989 U.S. Dist. LEXIS 18340, at *12 (W.D. Tex. May 16, 1989); *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 704 (Tex. 1996); *Coastal Corp. v. Torres*, 133 S.W.3d 776,

---

[71]     *See* Second Amended Complaint [Doc. # 58], ¶ 22.

780–81 (Tex. App.—Corpus Christi 2004, pet. denied); *Russell v. Am. Real Estate Corp.*, 89 S.W.3d 204, 211 (Tex. App.—Corpus Christi 2002, no pet.); *Glauser v. State Farm Life Ins. Co.*, 1994 Tex. App. LEXIS 2198, at *48–*49 (Tex. App.—Houston [1st Dist.] Aug. 31, 1994, writ. denied); *Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930, 933 (Tex. App.—San Antonio 1989, writ. denied).

In support of its position, Coachmen relies primarily on *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116 (Tex. 1976). In *Colonial Savings*, the defendant bank held a mortgage on property purchased by the plaintiff which included two residences. Pursuant to a provision in the deed of trust, the bank secured fire insurance for the property and informed the plaintiff that if he wished to alter certain terms of the policy, the bank would facilitate the changes. When the plaintiff later learned that the policy did not cover the second building on his property—which had suffered fire damage—he sued, alleging negligence. The court, citing § 323 of the Second Restatement of Torts, held that under the facts of the case, the defendant voluntarily assumed the role of an insurance agent. *Id.* at 119. Thus, having volunteered to provide insurance coverage for the plaintiff's property, the bank "had a duty to exercise reasonable care to perform this undertaking." *Id.* at 120.

Coachmen construes *Colonial Savings* as vastly expanding the Restatement view of "voluntary undertaking." However, the Court is not persuaded that such a

broad interpretation of the case is warranted.  First, the facts in *Colonial Savings* are significant, given that Texas has long recognized the common law duty of an insurance agent "to use reasonable diligence in attempting to place the requested insurance and to inform the client promptly if unable to do so."  *May*, 844 S.W.2d at 669 (citing *Burroughs v. Bunch*, 210 S.W.2d 211 (Tex. Civ. App.—El Paso 1948, writ ref'd)).  It is not clear that the *Colonial Savings* court expressly eschewed the Restatement's "physical injury" requirement; rather, a primary concern in the case was whether the defendant bank assumed a role as an insurance agent, thus implicating the narrow common law duties of an insurance agent.  *See Colonial Sav. Ass'n*, 544 S.W.2d at 119, 120 n.2.  Further, the court appeared to implicitly adopt the "physical injury" requirement, as the fact of plaintiff's fire damage figured prominently in the court's discussion of § 323 of the Second Restatement of Torts:

> The rule as stated in [§ 323] . . . imposes liability for injuries caused by the negligent performance of a gratuitous undertaking, *if*, (a) the actor's negligence *has increased the risk of physical harm*, *or* (b) the injured party has *relied upon* the undertaking. [Plaintiff] argues that reliance was not a necessary element of his cause of action because Colonial's negligence increased the risk of harm.  We disagree.  Colonial's failure to obtain insurance on the house did not increase the *risk of fire to the house*.

*See id.* (emphasis in final sentence added).

Nonetheless, *Colonial Savings* does point out that the significance of the

Restatement's "physical injury" limitation is not altogether clear.  Indeed, Texas courts of appeals have yet to agree whether the Texas Supreme Court has expressly adopted § 323 of the Restatement, or whether it has established a broader common law of voluntary undertaking.  *See, e.g.*, *Tex. Farm Bureau Ins. Cos. v. Sears*, 54 S.W.3d 361,  368 (Tex. App.—Waco 2001) ("[W]e do not find that the Texas Supreme Court has ever expressly adopted [S]ection 323."(collecting cases)), *rev'd on other grounds*, 84 S.W.3d 604 (Tex. 2002).  Further, it is not clear how an expansive law of voluntary undertaking operates or, in the absence of authority on point, should operate, in the context of insurance, a field heavily regulated by statute, and for which Texas courts have expressed great hesitancy to expand negligence liability.[72]

In any event, the Court does not reach these questions at this time.  Assuming *arguendo* that Texas recognizes a general cause of action for "voluntary undertaking" negligence in this context, questions of material fact exist on every prong of the test for such a claim.  *See e.g.*, *Charles E. Beard, Inc. v. McDonnell Douglas Corp.*, 939 F.2d 280, 284 (5th Cir. 1991).  In order to succeed on a voluntary undertaking claim, a plaintiff must establish that "(1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, (2) the

---

[72]     *See supra* Part III.B.1 (discussing the limited common law duties of an insurance broker).

defendant failed to exercise reasonable care in performing those services, and either

(3) the plaintiff relied upon the defendant's performance, or (4) the defendant's

performance increased the plaintiff's risk of harm." *Tex. Woman's Univ. v. Methodist

Hosp.*, 221 S.W.3d 267, 284 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing

*Torrington Co.*, 46 S.W.3d at 838–39).  Moreover, the undertaking must be shown to

truly be "voluntary"; if a defendant is obligated to perform a duty—for example, if a

defendant has a contractual obligation to perform the service at issue—then there can

be no liability under this negligence theory.  *See, e.g.*, *Tex. Farm Bureau Ins. Cos.*, 54

S.W.3d at 368, *rev'd on other grounds*, 84 S.W.3d 604 (Tex. 2002); *Dukes v. Philip

Johnson/Alan Ritchie Architects, P.C.*, No. 2-07-095-CV, 2008 Tex. App. LEXIS

2235, at *27–*28 (Tex. App.—Ft. Worth Mar. 27, 2008, pet. filed).

Because questions of fact exist concerning Willis's contractual obligations with

respect to claims handling, there are also questions of fact whether any conduct by

Willis with regard to this negligence claim was "voluntary."[73]  It is also unclear from

---

[73]    Willis also argues that the "economic loss rule" precludes any negligence action by
Coachmen.  For purposes of this case, that rule determines when a duty is owed, and
hence, where recovery in tort is available, for losses that are the subject matter of a
contract, but the parties to the negligence claim are contractual strangers.  *See Trans-
Gulf Corp. v. Performance Aircraft Servs.*, 82 S.W.3d 691, 695 (Tex. App.—Eastland
2002, no pet.).  The cases cited by Willis do not involve claims of voluntary
undertaking, and it does not appear that that doctrine is relevant to the issues
presented by such a case, since, under a voluntary undertaking theory, the existence
of a duty is established not by the source of the alleged losses, but by the alleged
(continued...)

the summary judgment record whether Willis's interactions with ASC in April 2005

constitute affirmative undertakings for the benefit of *Coachmen* or whether they were

for the benefit of ASC. *See Coastal Corp.*, 133 S.W.3d at 780; *see also Hicks v. Lee*,

No. 04-02-00049-CV, 2003 Tex. App. LEXIS 2098, at *3 (Tex. App.—San Antonio

Mar. 12, 2003, no pet.). Similarly, it cannot be determined from the record whether

Coachmen relied on Willis, as opposed to ASC, to ensure that Gulf was properly

notified of the Brashears claim and whether, in either event, any conduct by Willis

was "necessary" for Coachmen's protection, given that Coachmen presumably was

in a position to provide notice to Gulf without Willis's (or ASC's) assistance. *See*

*e.g.*, *Kirk v. Precis, Inc.*, No. 2-05-297-CV, 2006 Tex. App. LEXIS 10635, at *20–*21

(Tex. App.—Ft. Worth Dec. 14, 2006, pet. denied). Indeed, the Court cannot

conclude as a matter of law that Willis's conduct was unreasonable, as the record does

not disclose why Willis referred ASC to Stewart Smith for assistance notifying

Coachmen's insurers of the Brashears claim.

Finally, questions of fact exist as to whether any conduct by Willis increased

Coachmen's risk of harm. Willis argues at length that it cannot be liable to Coachmen

on any negligence theory because Gulf used "late notice" as a pretext for improperly

---

[73] (...continued)
tortfeasor's affirmative course of conduct. Accordingly, the Court concludes that
Coachmen's voluntary undertaking claim is not affected by the economic loss rule.

denying coverage on the Brashears claim.  Thus, Willis argues that Gulf was the source of Coachmen's injuries regardless of any actions by Willis.  In response, Coachmen points to the affidavit of Gulf's corporate representative, Andrew Whitney, who testified that had Gulf received notice of the Brashears claim on the day Coachmen requested that ASC provide notice, Gulf would not have denied coverage.[74] Willis has moved to strike this evidence, arguing that Whitney's testimony was the result of a "'handshake deal' during mediation and settlement of Coachmen's lawsuit against Gulf" and is mere speculation.[75]   However, as the Court noted previously, these objections go to the weight to be given to Whitney's testimony, rather than to its admissibility.  As a court is not to make credibility determinations on summary judgment, *see, e.g.*, *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000), Whitney's testimony raises questions of material fact that preclude summary judgment on this claim.

Moreover, the inquiry is not whether Willis was the sole cause of Coachmen's injuries, but instead whether its conduct *increased the risk of harm* to Coachmen.

---

[74] *See* Coachmen's Response & Cross-Motion [Doc. # 121], Exh. AQ: "Affidavit: Andrew Whitney," ¶ 5.

[75] *See* Willis's Motion to Strike [Doc. # 102], ¶¶ 2–3.  Moreover, "[a]ll communications made during [alternative dispute resolution] proceedings . . . area confidential, are protected from disclosure, and may not be disclosed to anyone, including the Court . . . ." S.D. TEX. R. 16.4.I, *available at* http://www.txs.uscourts.gov/district/rulesproc/ dclclrl2005.pdf; *see also* TEX. CIV. PRAC. & REM. CODE § 154.053(c).

This inquiry is analogous to a question of proximate cause, which "is normally one for the jury." *Rudolph*, 763 S.W.2d at 933 (citing *Clark v. Waggoner*, 452 S.W.2d 437 (Tex. 1970)).  Accordingly, it remains to be proven whether Willis's alleged conduct caused any injury to Coachmen, cognizable under this negligence theory.

Because there are numerous open questions of material fact, the Court need not decide at this time whether recovery for purely economic injuries may be had on a voluntary undertaking theory.  Should a factfinder find that Willis bore no contractual obligation to place Gulf on notice of the Brashears claim, and find instead that Willis voluntarily undertook to give notice for Coachmen's benefit, that Willis failed to exercise reasonable care in the process, and that Coachmen either relied on Willis's conduct or suffered an increased risk of harm as a result, then the issue whether Coachmen is entitled to relief on a negligent undertaking theory will be presented for decision.

## IV.   **CONCLUSION**

Coachmen has demonstrated the existence of valid and enforceable contracts with Willis for the 2003-2004 and 2004-2005 insurance periods.  Although the Court finds that Willis had no contractual obligation to expressly inform Coachmen of Endorsement # 16 to the Gulf insurance policy, it does find that Willis contractually assumed some responsibilities for claims handling and oversight of Coachmen's third

party claims administrator.  However, the scope of those contractual duties present questions of genuine and material fact that preclude summary judgment for either party on these two breach of contract theories.

The Court further finds that while Willis owed no pertinent common law duties to Coachmen, there remain numerous genuine and material questions of fact whether Willis voluntarily undertook to notify Gulf of the Brashears claim in April 2005.

Accordingly, it is hereby

**ORDERED** that Defendant Willis of Illinois, Inc.'s Motion for Summary Judgment [Doc. # 79] is **GRANTED IN PART and DENIED IN PART**.  Willis is entitled to summary judgment on Coachmen's claim that Willis breached its contract with Coachmen when it allegedly failed to expressly inform Coachmen of Endorsement # 16 to the Gulf policy.  Willis is also entitled to summary judgment on Coachmen's common law negligence claim.  It is further

**ORDERED** that Coachmen Industries, Inc.'s Cross-Motion for Summary Judgment [Doc. # 85] is **DENIED**.  It is further

**ORDERED** that Coachmen Industries, Inc.'s Motion to Clarify [Doc. # 129] is **DENIED**.  It is further

**ORDERED** that Coachmen Industries, Inc.'s Motion to Strike [Doc. # 184] is

**DENIED AS MOOT**.  It is further

      **ORDERED** that Willis of Illinois, Inc.'s Motion to Strike [Doc. # 102] is

**DENIED AS MOOT**.

      SIGNED at Houston, Texas, this 27th day of **June, 2008**.

Nancy F. Atlas
United States District Judge